[No. 2433.]

R. S. PAGE *v.* THE STATE.

1. JURY LAW—NEW TRIAL.—Second cousins are related to each other in the third degree. One of the grounds of challenge for cause to a juror is that he is related to the injured party within the third degree of consanguinity or affinity. It is made to appear in the motion for new trial in this case that one of the trial jurors was the husband of the second cousin of the alleged injured party, and that, upon his *voir dire*, he stated that he was not related to the injured party by consanguinity or affinity, and that he was accepted by the defendant under the belief

that his statement was true. *Held*, that the new trial should have been awarded.

2. THEFT—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for cattle theft, wherefore a new trial should have been awarded.

APPEAL from the District Court of Madison. Tried below before S. R. Perryman, special judge.

The conviction in this case was for theft and the penalty assessed by the verdict was a term of three years in the penitentiary.

Will Allphin was the first witness for the State. He testified that he lived in Madison county, Texas, and lived there during the year 1883. The witness lost the cow described in the indictment from her range on "P. D." prairie, about five miles from the town of Madisonville, in November, 1883. She was a black and white pided cow, four years old, branded 6C and in a mark not now remembered by the witness. The witness bought that cow on the range from Phil Bingham and never changed her brand or mark. Witness had never given the defendant nor other person permission to take that cow. He had never seen the animal since she disappeared from her range in November, 1883. A few days after the cow was missed the witness, with constable Hawkins, who had a search warrant, and one Hudgins, went to the defendant's premises and near those premises found the head and half the hide of a cow which he firmly believed were the head and half of the hide of his said cow. Of this, however, he could not be absolutely certain. The head was found about a hundred yards from the defendant's house, in the orchard, and the half hide in some weeds not far from the head. The piece or half hide was green and rolled into a bundle. The place, near by, where a beef had been slaughtered, was also found. The witness had never observed the brand on the cow but the one time that Phil Bingham pointed it out to him. It was branded 6C on the right shoulder. The half hide found was the left half and it had no brand on it. Buzzards were hovering about the head when it was found. The witness took the head and half hide to Madisonville and delivered them to the justice of the peace. There was nothing peculiar about the head except the small white spot in the forehead. Witness found the head and half hide about three, or perhaps four, weeks after he last saw his cow on the range. Neighborhood roads passed

on either side of the defendant's house. The witness and others looked for the cow after she disappeared from the range. Her range was about three miles distant from witness's house. The defendant lived about two miles from witness's house, towards and within a mile of "P. D." prairie. Witness had never had the cow at his house and no one had milked her since witness bought her. She had a yearling calf when she disappeared. The defendant owned a considerable number of cattle on the "P. D." prairie.

Before the witness missed the cow from the range he sold her and a number of other cattle to Moses Ford. Mr. Ford paid witness the entire amount of the purchase money agreed upon, including twenty dollars for the Bingham cow. He paid the witness in an order upon a party in Huntsville, from whom the witness collected the amount. The witness had put Ford's brand on all the cattle he sold him except the Bingham cow. The witness had agreed to put Ford's brand on the Bingham cow, and it was understood that title to the cow did not pass to Ford until the brand was so put on. Witness repaid Ford the twenty dollars paid him for this cow after this prosecution was instituted. The ears were on neither the head nor hide when found by the witness. After witness's discovery of the head and half hide, Phil Bingham came to the witness in town, and asked witness: "What about the cow that Page killed?" Witness took him (Bingham) to the head and hide and showed them to him. Bingham then asked witness: "What in the hell does he mean? What will it take to satisfy you and stop this matter?"

Moses Ford, testifying for the State, corroborated the witness Allphin as to the purchase of the Bingham cow. He exhibited the contract of purchase, and the recission of the same as to the Bingham cow, supporting Allphin's statement in regard thereto.

Alonzo Hudgins testified, for the State, that he had known the Bingham cow about a year before she disappeared from the range. Allphin bought her from Bingham, and asked witness to find her and put his (Allphin's) brand on her. Witness never found her. Witness last saw the said cow on the "P. D." prairie, two or three days before she is alleged to have been killed. Witness, while not absolutely sure, was well satisfied that the head and half hide found on the defendant's premises were remains of the Bingham cow. The brand on that cow was

6C, low down on the left shoulder. The white spot in the head was shaped somewhat like a smoothing iron.

R. G. Darby testified, for the State, that he was a witness in the proceedings of the examining court in this case. On that trial he saw the head and half the hide of a cow, which he then identified as the remains of a cow belonging to Will Allphin. The defendant was arrested on Monday, the day before the witness was summoned before the examining court. On the Tuesday or Wednesday of the previous week the defendant and Booth Page drove twenty or thirty head of cattle by the witness's house. That bunch of cattle included the Will Allphin cow. Witness was standing on his gallery, and the cattle passed witness's house at a distance of two hundred yards, the animal described in the indictment being on that side of the bunch next to the witness. Defendant and Booth Page were then driving the cattle from behind the witness's place, towards the defendant's house, which was about two thousand varas from the witness's house. The Allphin cow was owned by Phil Bingham before she became the property of Allphin. She ranged behind, and about the witness's place. She was a white faced, black and white pided cow, branded 6C or 60 on one or the other shoulder. The witness did not remember how she was marked. When witness first saw that cow on the range, about twelve months before, he took her to be an estray, thought her presence on the range suspicious, and took her mark and brand down in a memorandum book, which he has since lost. Witness's eye sight was not good owing to disease and encroaching age. John Yarbrough was with the witness on his gallery when defendant and Booth Page passed his house with the drove of cattle. The cow head exhibited to the witness on the examining trial was, to the best of witness's knowledge and belief, the head of the animal the witness saw in the bunch of cattle driven past his house by defendant and Booth Page. The witness was not so certain about the hide, and would not swear with absolute certainty to either. Witness's feelings for the defendant were not good, and might be called unkind.

Fred Conner testified, for the State, that he knew the cow described in the indictment. Witness sold her to Bingham when she was a yearling. She returned to witness's house and remained three years, when Bingham came and got her. She then had a calf. The witness thought he saw that cow's head in the court house yard at the time of defendant's examining

trial. That cow had a very pretty head and very smooth horns. Witness, acting for his mother, sold Phil Bingham thirty-five head of cattle, for which a bill of sale was executed, which bill of sale was at this point read in evidence by the State. The cattle thus sold to Bingham included three or four marks and brands. The home cattle, twenty-one in number, except the calves, were branded MC, generally on the right hip. The calf sold to Bingham was very much like its mother. The mother was branded 6C. Bingham took that cow away from the witness's house, and witness never saw her again before he saw the head on the day of the examining trial. Witness could not swear with absolute certainty that the head he saw at the said examining trial was the head of the Allphin cow. The witness and the defendant were not on speaking terms, and had not been for a long time. Witness denied that, a few days after the examining trial, he told Andrew Parks, in Madisonville, that the cow he had sold to Bingham, and which Bingham sold to Allphin, was branded MC. The State closed.

Phil Bingham was the first witness for the defense. He testified that he married the defendant's daughter, and lived with him in 1883, until the fall of that year, when he moved to his present abode. Witness bought thirty-five head of cattle from Fred Conner in 1879. He took a bill of sale for the same, which bill of sale set out the brands and marks of the cattle. Twenty-one of the home cattle were branded MC, and the bill of sale so stated. The witness remembered distinctly that the calves were all branded MC. The cow witness sold Will Allphin was branded MC on the hip, and witness afterwards branded her 6C on the right shoulder. Witness put that same brand on the other cattle he bought from Conner. He owned no brand of his own, and used the 6C, which was his step grandmother Crabb's brand. He used that brand with his said grandmother's consent, in order to distinguish his cattle from those of other members of his family. The witness attended the defendant's examining trial in 1883, and saw the head and half hide of an animal there exhibited. There was no brand on the half hide, which was the right half. The witness then knew the defendant's twenty-five or thirty head of cattle. Defendant owned two cows very much like the cow witness sold Allphin. Defendant let George Park have one of those two cows, and witness had not seen the other one since the alleged theft of the Allphin cow. The one retained by defendant was rather under the medium size, and was pided

black and white in color. Witness did not remember whether she had a white face or not. She had small crumpled horns. The hide exhibited at the examining trial was cut lengthwise, the part preserved being little more than half of the whole. When witness got the cow from Conner the second time she was four years old. Witness milked her a while and let George Park milk her a while. She ran on "P. D." prairie.

George Park testified, for the defense, that in the summer or fall of 1882, he milked a black and white pided cow which belonged to Phil Bingham, which animal was called the Conner cow. That cow was branded MC on one of her hips. Defendant had a cow which resembled Bingham's "Conner" cow very much.

Mrs. Phil Bingham, the daughter of the defendant, testified, in his behalf, that she well knew the cow sold by her husband to Allphin. The defendant owned a black and white pided cow very much like her. Witness broke both of these cows to milk. Defendant's black and white pided cow, the one like the cow sold by Phil Bingham to Allphin, has never been seen on the range since the slaughter of the animal, which preceded the defendant's arrest for the theft of the Allphin cow. The cow sold to Allphin by Phil Bingham was branded 6C on the right shoulder.

John Yarbrough testified, for the defense, that he was at Mr. Darby's house on the day the defendant and his son passed, driving a bunch of twenty-five or thirty head of cattle. They passed Darby's house at a distance of about three hundred yards. Witness called Darby's attention to the cattle as a very pretty bunch. Darby replied: "Yes, Page used to brand more calves than all those cattle put together." He, Darby, said nothing then about the Allphin cow being in that bunch.

J. C. Morris testified, for the defense, that he was the justice of the peace before whom the defendant's examining trial was had. The larger part of the hide of a cow was brought into court. It was the right side. Witness examined it closely and critically, but found no brand of any kind on either the shoulder or the hip. Witness was absolutely positive that it was the right side of the hide which was produced on that trial, and that it was unbranded.

Andrew Park testified, for the defense, that, between one and five days after defendant's examining trial, the witness Fred

Conner told him in Madisonville that the cow he sold Phil Bingham, and which Bingham sold to Allphin, was branded MC.

The motion for new trial raised the questions discussed in the opinion.

*Abercrombie & Randolph*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. On a motion for a new trial it was made to appear that one of the jurors who tried the cause was the husband of the second cousin of the alleged injured party. It further appears that said juror, before being accepted by the defendant, was interrogated upon his *voir dire*, and was asked the question if he was related to said alleged injured party by consanguinity or affinity, and he answered in the negative. Defendant asserts in his motion, which is verified by his affidavit, that at the time of accepting said juror as one of his triers he was utterly ignorant of any relationship existing between said juror and said alleged injured party, and relied upon the truth of said juror's statement, made under oath, that no such relationship existed.

One of the grounds of challenge for cause to a juror is that he is related to the person injured by the commission of the offense within the third degree of consanguinity or affinity. (Code Crim. Proc., Art. 636, sub div. 10.) Second cousins are related to each other within the third degree. (W. & W. Con. Rep., p. 267; Reed v. The State, 11 Texas Ct. App., 587; 1 Bouv. Law Dic., pp. 299, 300.) It was the defendant's right, therefore, to have the juror in question stood aside, and he alleges that he would have exercised this right if he had known of the existence of said relationship.

An effort was made on the part of the prosecution to show that defendant knew, or might have known by the use of reasonable diligence, of said relationship; but we do not think the evidence shows such knowledge on the part of defendant, nor that it shows any want of diligence on his part to obtain such knowledge. Of course, if defendant accepted said juror with a knowledge of such relationship, or if he accepted him without inquiring in regard thereto, he could not be heard to complain, but, as presented to us, the facts appear to be that he was entirely ignorant of the existence of this cause of challenge to

the juror, and that such ignorance was not attributable to neglect on his part. Such being the case, the defendant, without his fault, has been tried by a jury which the law does not regard as impartial, and has therefore been deprived of a right guaranteed by the Constitution to every one charged with crime. (Bill of Rights, sec. 10.) We are of the opinion that upon this ground of the motion the new trial should have been granted.

We are further of the opinion that the court should have granted a new trial because of the insufficiency of the evidence. As presented to us in the statement of facts, the evidence is unsatisfactory, and fails to prove beyond a reasonable doubt the guilt of the defendant.

We find no material error in the charge of the court. It is a full, fair and correct exposition of the law of the case.

Because, for the reasons stated, the court erred in not granting the defendant a new trial, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*